**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| vs. | ) Case No. 1:22-cr-00259-TNM |
| | ) |
| BERNARD JOSEPH SIRR, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**SENTENCING MEMORANDUM**
**ON BEHALF OF DEFENDANT BERNARD JOSEPH SIRR**

In the late evening of January 5, 2021, Bernard Sirr traveled from his home in Rhode Island to Washington, DC without any plans except to attend the former president's rally on January 6, 2021. He returned the next day ashamed of his conduct in the Lower West Terrace tunnel, where he joined a group of other rioters in a thoughtless attempt to protest the results of the 2020 presidential election at the Capitol.[1] Bernard has pleaded guilty in recognition that his behavior was illegal. Now 47 years-old with no prior criminal record, he faces punishment for what he did.

For the reasons below, Bernard submits the Court should sentence him to 36 months' probation with the condition that he provide 80 hours of community service, as well as pay $2,000 in restitution and the mandatory special assessment fee of $100. Such a sentence would be appropriate and serve the interests of justice in this case, chiefly because the events on January 6th were so perfectly out of character for him that there should be special exception and consideration for that. Should the Court find that his offense warrants a custodial sentence,

---

[1] "Where all think alike, no one thinks very much." –Walter Lippmann

however, a 30-60 day period of incarceration, followed by a 12-month term of supervised release, would not be greater than necessary to promote the goals of sentencing in this case.

## I.   SUMMARY OF ARGUMENT

Bernard Sirr is an honorably discharged Army veteran, master electrician, and decades-long true family man and law-abiding citizen. His offense took place during the afternoon of January 6, 2021 on the West side of the United States Capitol—a time and place this Court is undoubtedly familiar with, having presided over trials of multiple defendants whose offenses are connected to the Capitol breach.

For Bernard, he did not plan to protest at the Capitol building on January 6. Like many others, he attended the rally and made his way to the Capitol only after President Trump's speech. At the Capitol, Bernard advanced to the tunnel area of the Lower West Terrace where he would join a group of other rioters that confronted members of the Capitol Police and Metropolitan Police Department. A full account of his conduct is provided in the Statement of Offense (Doc. 38)—conduct that Bernard deeply regrets. That regrettable conduct, however, is not the end of the story with respect to fashioning an appropriate sentence.

While Bernard's participation in the January 6 riot is certainly worthy of punishment, a just result in this case does not require the imposition of a sentence as severe as the sentencing guidelines, probation, or the government might suggest. Bernard's offense must be judged in the context of other similarly-situated offenders so that unwarranted sentencing disparities can be avoided. Likewise, his history and many other good characteristics require consideration too.

A careful review of the sentences imposed in the January 6 cases shows that sentences in the advisory guideline range of 8-14 months' incarceration have been meted out in those instances where the defendant acted as a leader in the riot, possessed a weapon, wore body armor, assaulted law enforcement officers, entered and walked around inside the Capitol

building, or otherwise engaged in conduct readily distinguishable from Bernard, who even probation acknowledges was "average" among the non-peripheral offenders in the Capitol breach. (PSR ¶ 43.) Defendants found guilty of conduct more akin to Bernard's have instead received sentences ranging from probation and restitution, to 1-3 months of imprisonment–sometimes served in the form of home detention.

The sentencing chart filed herewith confirms this.[2] And as compelling a review of that chart and comparison of the cases might be, when this analysis is coupled with an honest application of the other federal sentencing factors—focusing on the history and characteristics of the defendant and need for punishment—the proposition that justice in this case will be served by a sentence well below the advisory guideline range becomes clear.

By all accounts, Bernard has led an ordinary and modest life. He has never been in trouble with the law prior to the instant offense. He is expected to never re-offend again. Further, he has been cooperative with the authorities and has acknowledged his guilt from the start of this case. Prior to changing his plea, he gave a voluntary interview to the FBI in which he admitted to his unlawful conduct and provided all the information he had about the events of January 6.

Furthermore, Bernard has already suffered real consequences for his actions and has been punished in ways that will be lasting. First, Bernard has pleaded guilty to a felony which will follow him for the rest of his days. Second, Bernard has lost a well-paying government job with benefits he likely would have held until retirement. Third, the publicity surrounding his offense continues to cost him as a master electrician now working on a freelance basis, which has created

---

[2] After taking inventory of the cases in which a January 6 defendant was sentenced for a conviction of 18 U.S.C. § 231(a)(3), defense counsel prepared a sentencing chart to summarize the sentencing data, relevant conduct, and noteworthy offender characteristics for each matter. A copy of that chart is attached as Exhibit A, and its information is current as of May 5, 2023.

a financial hardship for his family among other tangible burdens. It would be overly harsh to add a prison sentence to the list of consequences already endured by Bernard.

Even during that dark day which has brought shame to both Bernard and his family, bits of his core goodness shined through. Video, for example, shows him passing a flagpole over the police line to law enforcement to stymie its probable use as a weapon. Additionally, body-worn cameras recorded a conversation between an officer and Bernard in which he can be heard discussing pressing backwards against the mob to give officers a bit of breathing room.[3] This is not to deny that Bernard was in a place he shouldn't have been. Rather, it serves to highlight that even within the context of that fateful day, his core peaceful nature and respect for law enforcement were still at least partially visible.

For these reasons, after reviewing the offense conduct, sentencing guidelines, and applying the factors of § 3553(a), the goal of just punishment can be advanced here by a sentence of probation, community service, and restitution. But if the Court feels that the circumstances of this case require additional punishment, a brief period of incarceration—even if served as home detention, which would not be a plush staycation for him—would be sufficient but not greater than necessary to address his conduct in this case.

## II.   PERSONAL BACKGROUND

Bernard was born in June of 1975. He was raised in a town outside of Providence, Rhode Island called North Kingstown, where he enjoyed a happy and normal childhood. His parents did not have a lot of money, though he never knew they struggled financially. His late

---

[3] *See* the video files at <u>Exhibit B</u> through <u>Exhibit E</u>, which have been provided to the Court and the government via a secure filesite sharing platform.

father was a small business owner who had a landscaping company, and his mother—now retired and 75 years-old—was a math teacher. Bernard has a younger brother who today works in sales.

In June of 1993, Bernard graduated from North Kingstown Senior High School. After earning his associate's degree in science from the community college, Bernard made the selfless decision to enlist in the United States Army in 1997 until his honorable discharge in 2001. While in the Army, Bernard was stationed at Fort Drum in New York. He also deployed to Bosnia for a peacekeeping mission, where he lived for 9 months setting up checkpoints, searching for war criminals and weapons, and escorting civilians safely. His exemplary military service is noted by his Army service records which list multiple decorations, medals, citations, and campaign ribbons, including: a (1) NATO Medal (2nd Award); (2) Army Commendation Medal; (3) Army Achievement Medal; (3) Armed Forces Expeditionary Medal; (4) Army Service Ribbon; and (5) Marksman Marksmanship Qualification Badge with Rifle Bar. (PSR ¶¶ 100-101.)[4] Upon his honorable discharge from the Army in February of 2001, Bernard returned home to his family in Rhode Island.

Bernard married his teenage sweetheart Kathryn in December of 1999. Kathryn works with youth as a junior high school speech and language pathologist for a regional public school district in Rhode Island. Bernard and Kathryn have been happily married for more than 20 years, and together they raised two beautiful children: Joseph and Caroline.

Bernard's wife and children mean the world to him. This observation is shared by all who know him. As the many character letters point out, Bernard is a kind and loving husband and father. Like most dads, he has a special bond with his daughter who is a talented artist and full-

---

[4] Copies of the Army Commendation Medal and Army Achievement Medal are attached as Exhibit G.

time college student who Bernard helps support to this day for the reasons mentioned in the presentence report. (PSR ¶ 78.) Bernard is also very close to his son, brother, and mother. His mother in particular is elderly and physically more limited. She had both of her hips replaced and a complete shoulder replacement, so she depends upon Bernard. "[M]any things I used to do are difficult or almost impossible for me to do now. He is very helpful . . . and does all he can to make my life easier. My house has stairs and what he does helps me to stay in my home of 53 years."[5]

For employment, Bernard has worked steadily since separating from the military. Hardworking and entrepreneurial, he first enrolled in the JATC Apprenticeship Program at IBEW Local 99 in Cranston, Rhode Island to become a certified master electrician in the state. More recently, he worked full-time as a Building and Grounds Coordinator for the Rhode Island Atomic Energy Commission at its Nuclear Science Center (RINSC) on the University of Rhode Island Bay Campus in the Town of Narrangansett. Bernard was a valued nuclear facility engineer, and he hoped to stay working there notwithstanding his offense.

In the swirl of press immediately following his arrest, many in the media raised questions about the continued safe operation of the reactor and facility with Bernard. Assistant Director of the RINSC Michael J. ("Jeff") Davis swiftly addressed such questions, commenting publicly to the Boston Globe that: "We are a very small agency. We have 8.6 full-time equivalent[ ] employees. This is someone I worked with for years and I have a sense of his character. We don't see him as a threat."[6] Unfortunately, Bernard was terminated from his job a month after his

---

[5] *See* Letter of Christine A. Sirr, attached as <u>Exhibit F</u> at 4-5.

[6] Amanda Milkovits, *Employee at R.I. Nuclear Science Center indicted in Jan. 6 insurrection*, Boston Globe, Jun. 29, 2022, *available at*

arrest because of the negative publicity his offense generated. Bernard hoped for other employment with similar pay and advancement opportunities following his termination, but prospects were limited. Accordingly, Bernard put his electrical training to use and now works as a self-employed master electrician.

On June 29, 2022, Bernard was arrested at his mother's home in North Kingstown— where Bernard, his wife, and their daughter have been residing since June of 2021 while Bernard builds their new family home on the plot of land he and his wife purchased in West Greenwich. Space at his mother's house is limited. His son correspondingly lives separately at his maternal grandparents' house. With the reduction in family household income due to Bernard's job loss, Bernard has been acting as the general contractor to finish building the new family home and save money.

### III.  OFFENSE CONDUCT

With the exception of January 6th, Bernard has lived the past four-plus decades of his life peacefully without ever having been accused of a crime. He was simply an ordinary American who loved his family, cherished his friends, and paid his taxes.

Why then would Bernard, an Army veteran, doting husband and father, and good citizen with a respectable background and stable job come to DC—like thousands of other average American citizens from all over the country—to commit these crimes? District Judge Mehta addressed this issue not long ago during a hearing in the sentencing of Andrew Cavanaugh. Judge Mehta alluded this was able to occur because of:

> the power of the propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from people when it wasn't. It was an honest and fair election by every measure, yet

---

https://www.bostonglobe.com/2022/06/29/metro/second-rhode-islander-is-indicted-jan-6-insurrection/ (last visited May 16, 2023).

people were told over and over and over again something that was not true, so
much so that people like [the defendant] lost his way. While he's not blameless . .
. [t]he idea that, you know, people who have otherwise led modest and humble
lives, who have not been political agitators, political activists, are now facing
serious jail time is extraordinary.

(*See* Oct. 13, 2022 Sentencing Hr'g Tr. at 27-28, *US v. Cavanaugh*, Case No. 1:21-cr-362-APM

[Doc. 41].)

Concerned by the former president's words, Bernard had grown increasingly engaged in
politics during the Trump presidency and spent much of his spare time listening to podcasts and
consuming political content on the internet. Bernard presented himself as a supporter of
President Trump. And because Trump and his surrogates urged supporters to come to
Washington to attend a rally on January 6 to protest an election they repeatedly described as
fraudulent and stolen, Bernard decided to make the trip.

Bernard didn't have any friends in Rhode Island to go with him. He also didn't wish to go
alone. So he spoke about it with a longtime friend who served in the Army with him and now
lived in Virginia. This friend referred Bernard to a local group of guys in Rhode Island who
would be interested in attending the rally. Bernard met with them a couple times about a month
in advance of January 6, and Bernard eventually decided to drive down in the same car with
three of them.

Bernard did not come to Washington, DC with the intent to storm the Capitol. He did not
bring any weapons to the District. Nor did he bring any defensive gear. The same is true with
respect to the other three guys who traveled with him. The reality is that people like Bernard
were told lies, fed falsehoods, and believed that our election was stolen when it clearly was not.
Regrettably, decent people like Bernard took such falsehoods and lies to heart. His love of
country was used against him, and Bernard answered the call to stand up and defend our nation

believing it was threatened. As distorted as Bernard's mindset was at the time, his heart was set

on doing what he thought was right. Of course Bernard now knows that he was tricked by the

people he trusted. He understands that his conduct was harmful and inexcusable, and he is

profoundly saddened by the fact that he was a member of a mob that took part in what is a great

national embarrassment.

* * *

On the morning of January 6, Bernard watched the speeches at the rally near the ellipse.

Later that afternoon, he joined the throngs of people who marched to the Capitol following the

president's speech. While en route, people were showing each other pictures on their phones that

depicted protestors being physically harmed by the police and the ensuing violence happening on

Capitol grounds. Caught up in the hysteria of the crowd, Bernard continued onward to the

Capitol. He became separated from the small group he had traveled with from Rhode Island.

Walking in a line full of strangers, he advanced toward the tunnel area of the Lower West

Terrace. On arrival, he committed the offense described in the written proffer in support of his

change of plea, which Bernard assumes the Court is familiar with and he will not belabor here.

In short, Bernard appeared in the tunnel area two times. He first entered the tunnel at

approximately 3:08 p.m., making his way toward the front of the police line. He was directly

behind the front line of rioters who were engaged in an assault against police officers. The group

of rioters surrounding him began chanting "heave! ho!" in unison as they moved back and forth

together against the police line guarding entry into the Capitol building. He exited soon after at

3:14 p.m. but stayed in the area on the Capitol grounds outside.

An hour later, at approximately 4:14 p.m., Bernard reappeared near the tunnel doorway.

He had no intention of going back for a second time. He observed a man and woman with their

teenage son and tried to tell them that there was no good reason for them to be there. Having failed to dissuade them—or better yet follow his own advice—he found himself walking back up the stairs to the mouth of the tunnel to assure their safety. When he reached the top of the stairs, the couple and their son had apparently abandoned him and turned back. Bernard remained and was once again swept up in the fervor of the large crowd of protestors.[7]

The government has focused its evaluation of Bernard's relative culpability on the fact that he engaged with the Lower West Terrace tunnel twice. Though true, Bernard has been adamant from the beginning that his aim was never to do harm. He never engaged in any violence or assault of a law enforcement officer. He never caused any damage to public property, and he never entered into the Capitol building.

Bernard readily acknowledges he should have never been there at all. However, as video evidence of the incident will affirm, Bernard's conduct that day was not all bad. During his second appearance in the Lower West Terrace tunnel, while being pushed from behind and unable to leave, Bernard handed over a flagpole displaying the American flag to prevent its use as a weapon by other rioters against law enforcement. He also helped hold back an advancing mob against a tiring police line which allowed the officers to shift their position. The undersigned has provided the Court with a number of brief video files that depict all this—files that were sourced from a CCTV camera in the Capitol as well as police body-worn camera footage from the Metropolitan Police Department.[8]

---

[7] The undersigned has been unable to locate surveillance footage or open source video evidencing Bernard with this family. Defense counsel nevertheless notes that every other factual description provided by Bernard of his January 6 conduct has borne out by video, and counsel assumes the absence of video confirming this particular event is due to the absence of an appropriate angle or nearby camera rather than it not being true or occurring.

[8] *See* Exs. B through E.

On September 9, 2022, Bernard sat down for a lengthy pre-plea interview with the FBI at the U.S. Attorney's Office for the District of Massachusetts in Boston. Bernard confessed to his crime, accepting responsibility for his conduct and expressing regret to the special agents and other officers who interviewed him. He also answered all of their questions to help authorities as best he could, which the government acknowledges in its submission. On January 27, 2023, Bernard pled guilty to Count One of the Indictment, charging him with violating 18 U.S.C. § 231(a)(3). He now stands prepared to be sentenced by the Court.

## IV.  THE SENTENCING GUIDELINES AND ADVISORY GUIDELINE RANGE

The sentencing guidelines do not expressly specify an applicable guideline for the civil disorder offense of 18 U.S.C. § 231(a)(3). Where the guidelines do not promulgate an applicable guideline, courts are to apply the most analogous offense guideline. *See* USSG § 2X5.1. The most analogous guideline in this case is USSG § 2A2.4.

Pursuant to USSG § 2A2.4(a), the base offense level is 10. There is a 3-level increase under USSG § 2A2.4(b)(1)(A) if the offense involved physical contact. The government has not been consistent in its application of the physical-contact enhancement in the Capitol breach cases. The government and probation submit a 3-level increase is appropriate. Giving a 2-level reduction for Bernard's acceptance of responsibility, probation calculates an advisory guideline range of 8 to 14 months of imprisonment, resulting from a total offense level of 11 and Criminal History Category I. The guidelines further provide that the fine range for a total offense level of 11 is from $4,000 to $40,000, pursuant to USSG § 5E1.2(c)(3), and restitution must be ordered per USSG § 5E1.1.[9]

---

[9] Per the terms of his Plea Agreement, Bernard has agreed to pay restitution in the amount of $2,000. (Doc. 37.)

The above guidelines, however, are merely "the starting point." *Gall v. United States*, 552 U.S. 38, 49 (2007). They are not the only consideration in formulating a fair and just sentence, for no workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *United States v. Ovid*, 2010 WL 3940724, at *1 (E.D.N.Y. 2010).

## V.   THE 18 U.S.C. § 3553(a) FACTORS

The primary directive in § 3553(a) is that the Court must impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing. 18 U.S.C. § 3553(a). Compliance with this statutory mandate requires a court to make an individualized assessment of the defendant and consider each of the factors set forth in § 3553(a). These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the range established by the sentencing guidelines, any pertinent policy statement from the sentencing commission, the need to avoid unwarranted sentence disparities, and the need to provide restitution to any victims. Consideration of the factors here supports a non-advisory guideline and non-custodial sentence.

### A.   The Defendant's History and Characteristics

Bernard's history and characteristics are recounted in the Personal Background section above as well as in the presentence report. In summary, Bernard is a 47 year-old man who has lived in Rhode Island throughout his entire life. He has a loving and devoted wife with whom he has raised two remarkable children. He is surrounded by extended family. He currently resides in the basement of his mother's house while he works to complete a new family home he is building on land he and his wife purchased in rural Rhode Island. He is an electrician by trade. His clothes are not fancy. He drives a pickup truck, while his wife has a small SUV. On Sundays, he attends services at church.

In every way, Bernard leads a regular life. He deposits his paychecks, pays his bills, and lives within his means. He helps his elderly mom with chores, supports his children as needed, shovels the snow in the winter, and visits the New England beaches on occasion in the summer. His character has never been called into question. As the testimonials from his family, friends, minister, and others make plain, Bernard is a good and trustworthy person. Even his former supervisor at the RINSC quelled negative suspicions about Bernard following his arrest in this case and writes on his behalf still.[10] Bernard is kind and generous. He is honest, thoughtful, and hardworking. These good qualities should not be overshadowed by what was a totally aberrant act for him. *See, e.g.*, *United States v. Howe*, F.3d 128, 132 (3d Cir. 2008) (affirming probationary sentence where applicable guidelines range was 18 to 24 months, as defendant's conduct was an "isolated" event in an otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (finding basis for variance because the defendant was a "law abiding citizen, who [did] an incredibly dumb thing"). A sentence within the advisory guideline range of 8-14 months' incarceration would therefore be far in excess of what is necessary in this case.

**B.     Nature and Circumstances of the Offense**

The nature and circumstances of Bernard's crime are discussed in the Offense Conduct section above. While the facts constituting his crime for which he is ashamed need no repeating, it merits re-emphasizing that Bernard has otherwise lived a peaceable life. Bernard came to Washington, DC on January 6 because President Trump encouraged American citizens to come to this city. The President of the United States, who had promised that the event would be "wild," urged these citizens to march to the Capitol after giving a speech stressing the

---

[10] *See* note 6, *supra*. *See also* Letter of Michael J. Davis, attached as Ex. F at 26.

importance of this moment in history and the necessity to fight to stop the certification of the election. While this by no means excuses Bernard's conduct that day, it does provide context for his actions: Bernard was acting in response to repeated calls for protest and that strong Americans not sit idly by to permit what the former president and others trumpeted was an election rife with widespread fraud. Bernard acknowledged his wrongdoing, fully accepting responsibility. Following his arrest in this case, Bernard willingly cooperated with the arresting officers. His cooperation with the government was full, transparent, and complete.

**C.      Need for the Sentence to Afford Adequate Deterrence, Protect the Public, Promote Respect for the Law, as well as Provide Just Punishment**

There is little need to deter Bernard, who has never done anything like this before and will never do so again. Notwithstanding his thoughtless and momentary lapse in good judgment on January 6, Bernard presents a vanishingly low risk of recidivism. His exemplary conduct and high moral qualities should make it impossible for the Court to believe that Bernard represents a danger to the public.

The need to promote respect for the law and to provide just punishment in this case also does not require the imposition of a sentence within the advisory guideline range, as Bernard has already suffered severe consequences for his wrongs. The publicized nature of his prosecution similarly sends a strong message to anyone who considers acting in a way that violates the laws he has transgressed.

On a personal level, the impact of the arrest on Bernard has been sobering. He has pled guilty to a felony despite being considered one of the "average" non-peripheral offenders of that day. Bernard has never before been convicted of any crime, much less a felony, and he will suffer the collateral consequences of that for the rest of his life. Every effort to find new

employment will be hindered by a felony on his record. He can never possess a firearm. His right to vote is restricted. These and other consequences of his felony conviction cannot be overstated.

Bernard has had a great deal of time to reflect on the choices he made to bring him to this low point in his life, and he has had to confront his personal shame, embarrassment, as well as face what will be his new future. Simply put, Bernard is now a felon who participated in the Capitol riot on January 6—a day that will linger in this country forever. In the age of the internet, his case and guilty plea will follow him wherever he goes. Merely Googling his name yields a page full of articles from the Boston Globe, Providence Journal, Warwick Post, and other local and national news sites, all of which echo in headlines his horrible mistake to participate in the riot. This almost assures that his future job prospects as an enterprising contractor will forever be uncertain. No one would wish to follow this fate, and Bernard has felt the weight of these consequences, and his remorse is genuine and deep.

### D.    Need to Avoid Unwarranted Sentencing Disparities

Finally, as to the need to avoid unwarranted sentencing disparities, the imposition of a sentence within the advisory guideline range would result in a sentence that is far greater than that imposed to date on any of the other defendants who engaged in similar conduct and were convicted of the same crime.

The sentencing chart attached as Exhibit A summarizes the sentencing information and relevant offense conduct for each of the Capitol breach cases involving the crime of § 231(a)(3). Nineteen of these defendants have been sentenced of a single-count violation of § 231(a)(3), while dozens more have been sentenced in multiple-count convictions to include § 231(a)(3). A small sampling of these January 6 cases are reviewed below, with key parts in the relevant conduct highlighted for the Court's convenience.

1.      **Cases with Sentences for a Single Count Conviction of 18:231(a)(3)**

| Case | Sentence Imposed | Relevant Conduct and Offender Characteristics |
|---|---|---|
| **Baugh, Roger Kent**<br><br>1:22-cr-313-JEB<br><br>Guilty plea | 12 months and 1 day incarceration<br>24 months' supervised release<br>$2,000 restitution | Baugh and his friend Mark Mazza entered the West Terrace front. Baugh knew Mazza was armed with a concealed firearm—a firearm that Mazza loaded with shotgun shells and hollow point rounds. Baugh entered the LWT tunnel with Mazza where they both engaged in several heave-ho efforts with the violent mob. Baugh retreated, but again returned for a second effort taking up a position at the mouth of the tunnel. He watched the rioters attack the officers. Mazza was one of those rioters inside the tunnel, who took a metal baton from an officer and struck him with it. Baugh knew Mazza stole this police baton. Baugh then joined the other rioters, pushing and yelling "heave! ho!" in a combined effort to overwhelm and break through the police line. Baugh knew that Mazza lost his firearm at the Capitol and that Mazza intended to file a false police report. After Mazza's arrest, federal investigators interviewed Baugh twice, during which he lied both times. Baugh falsely denied that he entered the tunnel area or had been involved in any violence against officers. |
| **Blair, David**<br><br>1:21-cr-186-CRC<br><br>Guilty plea | 5 months' incarceration<br>18 months' supervised release<br>$2,000 restitution | Blair was in a crowd that was illegally on the west lawn of the Capitol. MPD officers ordered the crowd to back away from the Capitol. Blair positioned himself between the officer and the crowd and began to walk in the space while waiving a Confederate battle flag attached to a lacrosse stick. He yelled "hell naw, quick backing up, don't be scared." As officers advanced, one pushed Blair back toward the crowd. Blair jumped back, squared his body to the officer, and shouted, "What's up motherfucker, what's up, what's up bitch?" Blair then thrust the lacrosse stick toward the chest area of Officer K.P., striking him. Several officers then restrained Blair on the ground, thereafter removing him from the west lawn to process his arrest. |
| **Cooke, Nolan**<br><br>1:22-cr-52-RCL<br><br>Guilty plea | 12 months and 1 day incarceration<br>36 months' supervised release<br>$2,000 restitution | Cooke joined the front lines of the riot, helping lead the charge to break through the police line on the east side. Cooke was part of the crowd that shoved their way through a group of USCP officers, who were providing security at the Rotunda Doors. While in this crowd, Cooke yelled the following statements, among others, "There's a storm coming." "Get these motherfuckers." "We're coming through." "Nothing's holding us back." Cooke ultimately climbed the steps to the Capitol where he met more officers. He made physical contact with them as he tried to push through the crowd. When he reached the door of the Capitol, he banged on a window with a flagpole displaying the American flag. Though the government had no evidence of |

| | | |
|---|---|---|
| | | Cooke himself entering the Capitol building, he encouraged others to "Break the glass." "We're going in this way." |
| **Cortez, Christian Glenn**<br><br>1:21-cr-317-TSC<br><br>Guilty plea | 4 months' incarceration<br>36 months' supervised release<br>60 hours' community service<br>$2,000 restitution | Cortez joined a crowd of rioters climbing the stairs on the west side of the Capitol, ultimately reaching the Upper West Terrace. Cortez entered the Capitol through the Parliamentarian Door and traveled through the building before law enforcement stopped him and others from proceeding further. After leaving the building, Cortez joined a crowd in front of the North Doors, where rioters were attempting to break Capitol doors down. Cortez stepped in front of the doors while officers were trying to seal them, and Cortez began yelling at them, stating "Fuck you!" and "Oath breakers!" He slammed a blue-colored flag down and stepped in front of the doors. Officers pepper sprayed him. But even after being pepper sprayed, Cortez did not move and instead taunted the officers, yelling "Do it some fucking more!" |
| **Fairchild, Jr., Robert**<br><br>1:21-cr-551-TFH<br><br>Guilty plea | 6 months' incarceration<br>$2,000 restitution | Fairchild wrestled away two police barricades from officers trying to maintain a perimeter in the area of the Capitol's West Plaza. Fairchild also engaged in the pushing and pulling of the barriers, tussling with law enforcement. On at least one occasion, he made contact with an officer. He later illegally entered the Capitol building through the Senate Wing Door. |
| **Gerwatowski, Eric**<br><br>1:22-cr-125-JMC<br><br>Guilty plea | 24 months' probation<br>30 days' home detention<br>60 hours' community service<br>$2,000 restitution | Gerwatowski was at the front of a crowd just outside the Upper House Doors. Capitol Police were attempting to close these doors to prevent more rioters from entering the building. Gerwatowski pulled open one of the doors that the Capitol Police had just closed. He then turned to the mob and yelled, "Let's go!" and directed more rioters into the building. He himself then entered the building, too. While inside, Gerwatowski walked down a corridor and could be heard stating, "They're raping kids and they're shooting kids" to another rioter who was livestreaming. Gerwatowski left the Capitol after being inside for about three minutes. Gerwatowski was also interviewed on camera outside the building, stating, among other things, "the commies are trying to steal the country" and that he believed the election was stolen. |
| **Grayson, Kenneth**<br><br>1:21-cr-224-TSC<br><br>Guilty plea | 2 months' incarceration<br>24 months' supervised release<br>$2,000 restitution | Grayson entered the Capitol building through the Senate Wing Door and proceeded to the Crypt. He also entered the Rotunda area. While there, Grayson found rioters who were pushing against a line of officers in an attempt to gain access to the adjoining hall. Grayson joined the rear of this group to push against the police officers. Grayson then moved to the side of the group toward the wall. Moments later, another rioter yelled "Push!" after which Grayson |

| | | |
|---|---|---|
| | | again joined the rear of the group to push en masse against the police line guarding the area.[11] |
| **Griswold, Andrew**<br><br>1:21-cr-459-CRC<br><br>Guilty plea | 75 days' incarceration<br>24 months' supervised release<br>$2,000 restitution | Griswold was part of a group of rioters that gathered together outside the Capitol's East Rotunda doors, surging toward the entrance to the building. Shouting "heave, ho!" Griswold pushed on a rioter in front of him and advanced toward the open doors. Once inside, Griswold made his way to the Senate Gallery.[12] After leaving the building, he spoke to a reporter declaring "We took the building. They couldn't stop us." and "Don't mess with us. Back off. This is our country. We showed 'em today. We took it. They ran. And hid." Later, Griswold deleted evidence from his cell phone, which the FBI was unable to recover or identify through forensic analysis of Griswold's phone. As for his criminal history, Griswold had 6 prior criminal convictions in early adulthood and another recent conviction for driving impaired, for which he was sentenced to probation and then later arrested on a probation violation and re-sentenced to further probation. |
| **Presley, Ronnie**<br><br>1:21-cr-257-RDM<br><br>Guilty plea | 12 months' incarceration<br>26 months' supervised release<br>$2,000 restitution | Presley illegally entered the Capitol through the Upper West Terrace doorway. Presley then moved to the Rotunda, shouting "Fight for this!" Multiple law enforcement officers tried to clear the Rotunda of rioters. Presley disregarded the verbal commands to leave and instead physically confronted one officer by leaning into the officer's baton. After Presley left the Capitol through the east Rotunda doorway, he remained nearby outside. When a police officer attempted to clear that area of rioters, Presley grabbed and pulled on a police riot shield. At the time of sentencing, Presely had prior state court convictions in Tenn. for domestic assault, reckless endangerment, driving while impaired, as well as felony burglary. |
| **Romero, Moises**<br><br>1:21-cr-677-TSC<br><br>Guilty plea | 12 months and 1 day incarceration<br>12 months' supervised release<br>$2,000 restitution | Romero participated in the push against police officers who were trying to keep rioters from entering the Capitol through the damaged Senate Wing Door. Officers created a temporary barrier out of wooden displays to stop the flow of rioters. Romero—in the front line of rioters—pushed the temporary barrier against the USCP officers, who were eventually overpowered. Romero and the other rioters succeeded in pushing through and into the Capitol. Once the barrier was broken, additional rioters entered the Capitol through the Senate Wing Door. |

---

[11] The government did not seek a 3-level increase in Grayson for an offense involving physical contact. (*See* Govt's Sentencing Mem., *US v. Grayson*, Case No. 1:21-cr-224-TSC [Doc. 51].)

[12] Also no 3-level increase in Griswold under the physical-contact enhancement. (*See* Govt's Sentencing Mem. at 27, *US v. Griswold*, Case No. 1:21-cr-459-CRC [Doc. 52].)

| Shough, Geoffrey<br><br>1:21-cr-197-DLF<br><br>Guilty plea | 6 months' incarceration<br>12 months' supervised release<br>200 hours' community service<br>$2,000 restitution | Shough marched to the Capitol wearing a body armor vest underneath a jacket, a ballistic-style helmet with an Oath Keepers decal on the back, goggles, hard-knuckle gloves, and a tan pouch attached at his hip. Shough was with a crowd of rioters illegally on the West Lawn of the Capitol grounds. He carried and waved a large Texas flag and cheered as other rioters attacked and overwhelmed police officers nearby on the Northwest steps. Shough then moved to the Northwest Courtyard outside the Senate Wing Door. Shough forcefully and unlawfully entered the Capitol through the Senate Wing Door. He was among the first individuals in the crowd that overwhelmed officers during the breach of the Senate Wing Door. After the rioters overwhelmed the officers, Shough engaged in a very animated conversation with one or more of the officers. During his plea hearing, he acknowledged telling the officers that they "should go home." He traveled through the Crypt, past the House Wing Door, and through the Hall of Columns before finally exiting the Capitol approximately 15 minutes after entry. |

### 2.    Cases with Sentences for Multiple Counts, Including a Conviction of 18:231(a)(3)

| Case | Offense of Conviction | Sentence Imposed | Relevant Conduct and Offender Characteristics |
|------|----------------------|------------------|-----------------------------------------------|
| Cantwell,<br>Lewis Easton<br><br>1:21-cr-89-CKK<br><br>Guilty plea | 18:231(a)(3) and 2 | 5 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | Cantwell joined rioters at the front of one of the entrances into the Capitol using his cellphone to make several video recordings of individuals battling officers. In one recording, he yelled "get the door open." In other recording, he yelled that they needed "fresh patriots to the front." At times, Cantwell participated in the mob by rocking back and forth while others chanted "heave ho" as they pushed against police. Cantwell also helped propel a flagpole toward the Lower West Terrace tunnel, where a variety of objects were being used to assault police. Cantwell recorded several videos, one in which he stated, "We've essentially stormed the Capitol building…we're tired of the bullshit." In another video, he said "liberty or death." In an interview with the FBI, Cantwell falsely claimed that he went to the Capitol doors to "help" people. In a Facebook post, he falsely said that he helped people and protesters, that there was no major property damage, |

| | | | |
|---|---|---|---|
| | | | and that he treated people with love and respect.[13] |
| **Mehaffie, David**<br><br>1:21-cr-40-TNM<br><br>Convicted after trial | 18:111(a)(1) and 2<br>18:231(a)(3)<br>40:5104(e)(2)(D) and 18:2<br>40:5104(e)(2)(F) and 18:2 | 14 months' incarceration<br>24 months' supervised release | Mehaffie—given the nickname #TunnelCommander by online investigators—was a key player in the melee and assault against law enforcement officers who were guarding the Lower West Terrace tunnel entrance. Mehaffie first made his way onto the restricted Capitol grounds with two other co-defendants (Patrick McCaughey and Tristan Stevens). While his co-defendants taunted officers at the West Front, Mehaffie yelled at nearby rioters, "If we can't fight over this wall, we can't win this battle!" The police line at the West Front failed due to the siege of the advancing mob. Mehaffie and others then scaled the Southwest scaffolding and staircase to converge at the LWT tunnel. Taking a clear leadership role in urging the crowd to keep pushing, Mehaffie hung from an archway at the tunnel entrance for 26 minutes giving orders, shouting direction, and coordinating the efforts of the mob to overpower the police. |
| **Mostofsky, Aaron**<br><br>1:21-cr-138-JEB<br><br>Guilty plea | 18:641<br>18:231(a)(3)<br>18:1752(a)(1) | 8 months' incarceration<br>12 months' supervised release<br>200 hours' community service<br>$2,000 restitution | Mostofsky—dressed as a caveman and carrying a walking stick or rod—was among the crowd of rioters that overwhelmed a police perimeter near the Peace Circle, due west of the Capitol building. Mostofsky and other rioters then reached the West Plaza, where Mostofsky joined a group of rioters pushing against a police line that was attempting to limit the crowd's access to the Capitol. Mostofsky broke the police line using his weight and strength. He then climbed the exterior stairs to the Capitol's Upper West Terrace and then headed to the Senate Wing Door. En route, he picked up a USCP bullet-proof vest and put it on. The crowd broke windows next to the Senate Wing Door, entered the Capitol and then broke the doors open from inside the building. Mostofsky entered through the door as the twelfth person to enter the Capitol building that way. Mostofsky picked up a U.S. Capitol Police riot shield and then |

---

[13] No request by the government for a 3-level increase in Cantwell under the physical-contact enhancement. (*See* Govt's Sentencing Mem. at 28, *US v. Cantwell*, Case No. 1:21-cr-89-CKK [Doc. 49].)

| | | | followed other rioters to a staircase, where they pursued a USCP officer upstairs and into the Ohio Clock Corridor, outside the Senate Chamber. Mostofsky gave an interview to a reporter and then left the building. He still had the police vest and riot shield with him until a Capitol Police officer took the shield away from him. |
|---|---|---|---|
| **Sargent, Troy**<br><br>1:21-cr-258-TFH<br><br>Guilty plea | 18:231(a)(3)<br>18:111(a)(1)<br>18:1752(a)(1)<br>18:1752(a)(2)<br>18:1752(a)(4)<br>40:5104(e)(2)(F) | 14 months' incarceration<br>24 months' supervised release<br>$500 restitution | Sargent stepped out of the crowd and swung his open hand at a USCP officer, making contact with the officer. Immediately afterward, another officer, instructed Sargent and others, "Do not start attacking people." Seconds later, Sargent again advanced toward the front of the crowd and swung his open hand toward the same officer; this time, he made contact with someone else in the crowd though he intended to strike the officer. In a social media message, he wrote "I got two hits in on the same rookie cop" and "yeah every time he came in his visor was all full of [mace so] I knew [he] couldn't see shit so I just jumped out from behind somebody punched him as hard as I could [right] in his [visor] ." |
| **Young, Philip S.**<br><br>1:21-cr-617-DLF<br><br>Guilty plea | 18:111(a)(1)<br>18:231(a)(3)<br>18:1752(a)(1)<br>18:1752(a)(2)<br>18:1752(a)(4)<br>40:5104(e)(2)(D)<br>40:5104(e)(2)(F) | 8 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | Young was illegally on the Capitol grounds, standing on the stairs leading to the Upper West Terrace. Someone in the crowd shouted "1,2,3 go!" and Young went up the stairs. Young was one of several people that lifted and pushed a metal bike rack barricade into a line of law enforcement officers from the MPD and Capitol Police. Young later made his way to the east courtyard of the Capitol, where he let air out of the tires of a federal government vehicle. |

### 3.   The Distinctions Between the Instant Case and Others are Manifold

As the above tables show, a comparison of Bernard's relevant conduct and life history to the conduct and history of these other defendants would not justify the disparity in sentencing that the applicable guidelines here would create. Indeed, the distinctions between Bernard's case and these others are manifold. Bernard did not possess a weapon or use defensive gear. He did not smash windows, break open doors, hold open doors, or physically damage public property.

21

He did not sabotage police vehicles or steal a police baton or body vest. He did not act as a leader in the riot, exercise managerial authority over any other participant, or direct other rioters where to go. He did not assault any law enforcement officers or encourage others to do so. He did not cheer on acts of violence and destruction. He did not shout any slurs, curse words, or get into any wrestling matches over police barricades. He did not breach the Senate chamber, House chamber, or walk around inside the Capitol building. He did not lie or make any false statements to the authorities, and he did not have a prior criminal record.

The defendants and offense conduct in the other Capitol breach cases involving § 231(a)(3) are different. To take just one example, consider Andrew Griswold whose offense conduct is arguably the most similar to Bernard's.

Andrew Griswold was a heave-hoer outside of the East Rotunda Doors who pushed in a coordinated fashion against the police line while chanting "heave-ho!" Pushing on the rioter in front of him, Griswold and the mob surged against the police. The similarities between the two cases, however, end there. Griswold entered the Capitol turning his body sideways to manage a narrow passage through the open doorway between the police and the doorframe. Once inside, Griswold climbed up on a bench and held up a mobile phone to take photograph or video. He then walked up a flight of stairs, hugging another rioter while pumping his fist in the air. Upstairs, Griswold made his way down a hallway where he entered the Senate Gallery. He spent 12 minutes inside the Capitol building. After exiting, Griswold bragged about his actions to a reporter and celebrated the human suffering the riot caused by taunting members of Congress who "ran and hid" and mocking police officers who "couldn't stop us." Later, Griswold destroyed evidence.

At the time of his sentencing, Griswold had six prior convictions. His extensive criminal history and recent 2018 conviction—for which he was sentenced to probation and then later arrested for a probation violation and re-sentenced to further probation—was not sufficient to deter Griswold from committing his crimes on January 6. Judge Cooper considered all of this, and on July 13, 2022 sentenced Griswold to 75 days of incarceration, followed by 24 months of supervised release, with an order of restitution in the amount of $2,000.

Bernard acknowledges his wrongdoing. He regrets his acts more than anything and his contrition—reflected in his pre-plea witness interview with the FBI—is honest and sincere. Given Bernard's law-abiding history, mindset at the time of the January 6 riot, deep remorse, and cooperation with the government, a non-advisory guideline and non-custodial sentence involving probation, community service, and restitution would be justified. But if the Court were to conclude that the instant offense requires more, a brief period of incarceration—even if served in the form of home confinement—followed by a brief term of supervised release, would not be greater than necessary to accomplish the goals of sentencing.

## VI.  CONCLUSION

Just punishment in this case does not require the imposition of a sentence as high as the advisory guideline range, probation, or the government might recommend. Bernard has already suffered greatly. He has lost his job. He is a convicted felon. He has felt the depths of shame, humiliation, and remorse for his actions. Moreover, he has accepted responsibility for his wrongs and has done everything he could to atone for them through cooperation with the government. For all of these reasons and those that will be presented during the sentencing hearing in this matter, Bernard respectfully prays that the Court depart from the prescribed guideline range, reject the sentencing recommendations made by the government, and instead impose the sentence defense counsel has requested herein. The Court should issue a restitution order in the

amount of $2,000. The Court should decline to impose a monetary fine. A special assessment of

$100 is mandatory, pursuant to 18 U.S.C. § 3013. In the event a custodial sentence is imposed,

the undersigned respectfully requests that Bernard be permitted to self-surrender.

Dated: May 16, 2023                         Respectfully submitted,

                                            /s/Robert N. Driscoll
                                            /s/Alfred D. Carry
                                            Robert N. Driscoll (DC Bar #486451)
                                            Alfred D. Carry (DC Bar #1011877)
                                            McGlinchey Stafford PLLC
                                            1275 Pennsylvania Avenue NW, Suite 420
                                            Washington, DC 20004
                                            Tel: (202) 802-9999
                                            Fax: (202) 318-1084
                                            rdriscoll@mcglinchey.com
                                            acarry@mcglinchey.com
                                            *Counsel for Defendant Bernard Joseph Sirr*